IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BROTHERHOOD MUTUAL INSURANCE COMPANY, as subrogee of RIVER VALLEY CHRISTIAN FELLOWSHIP, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 05 C 3408 |
| ERVIN CABLE CONSTRUCTION, LLC; GARY PASCO, individually and d/b/a PASCO CABLE COMPANY; and STEVEN GAMMELL, individually and d/b/a S.A. GAMMELL CONSTRUCTION, | ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Brotherhood Mutual Insurance Company (BMIC), as subrogee of River Valley Christian Fellowship, brought a diversity action for negligence against Ervin Cable Construction, LLC (Ervin), Gary Pasco and Pasco Cable Company (Pasco), and Steven Gammell and S.A. Gammell Construction (Gammell). BMIC alleged that defendants negligently installed cable lines in Bradley, Illinois by damaging a sewage pipe while completing the job. After the cable lines were installed, raw sewage and water from the damaged sewage pipe flooded the River Valley Christian Fellowship Church. The Church sustained over $180,000 in damage from the flooding. Pasco cross-claimed against Gammell for indemnification pursuant to their subcontract agreement, requesting payment for legal fees, expenses, and any liability that might be assessed against Pasco under the suit. BMIC settled with Gammell and dismissed its claims

1

against Ervin and Pasco, leaving only Pasco's cross-claim against Gammell.

Both Pasco and Gammell have moved for summary judgment on the cross-claim. Pasco also moved for sanctions under Federal Rule of Civil Procedure 11 against BMIC, its attorney Abosede Odunsi, and her law firm Swanson, Martin & Bell, LLP and for sanctions against Odunsi under 28 U.S.C. § 1927. For the following reasons, the Court denies Pasco's motion for summary judgment, grants Gammell's motion for summary judgment, and denies Pasco's motion for sanctions.

**Facts**

In 2003, Ervin had a contract to lay cable in the Village of Bradley, near the River Valley Christian Fellowship Church. Sometime thereafter, Ervin subcontracted with Fiber Cable, LLC to perform certain work on the project. On April 1, 2003, Fiber Cable and Pasco entered into a contract in which Pasco agreed to perform certain work as a subcontractor for Fiber Cable. On April 21, 2003, Pasco and Gammell entered into a subcontract for cable construction work on the project. Gammell and his team completed the construction and cable line work in December 2003.

On June 11, 2004, raw sewage and water flooded the Church from a damaged sewer pipe nearby. The Church maintained an insurance policy with BMIC. Pursuant to the insurance policy, BMIC paid $182,370.92 to repair the facility, which included costs for emergency decontamination, plumbing, carpentry, and painting.

The Village of Bradley investigated the sewage line breach and concluded that a cable line had pushed through a sewer pipe, causing damage to the sewer line. BMIC conducted its own investigation into the source of the damage and learned that Ervin had paid the Village of

2

Bradley $7,000 to fix the sewer line. BMIC tried to collect from Ervin for the damage to the Church. BMIC learned in its investigation that Ervin subcontracted with Pasco Cable for work on the Bradley cable project. Ervin forwarded BMIC's claim to Pasco's insurance company. BMIC also tried unsuccessfully to collect from Pasco.

On June 28, 2005, BMIC, as subrogee of the Church, filed a diversity action against Ervin and Pasco, alleging that they had been negligent in laying cable lines in Bradley. Pasco's counsel, Peter Berman, advised BMIC's attorney that although Pasco had a contract to lay cable in Bradley, he later subcontracted the project out to Gammell. In light of this new information, BMIC filed a second amended complaint in September 2005 naming Gammell as an additional defendant.

On October 7, 2005, Pasco filed an answer to BMIC's complaint, denying involvement in the Bradley cable line work. Pasco also filed a cross-claim against Gammell, requesting relief pursuant to indemnity and duty to defend clauses in their subcontract. After Pasco answered written discovery and stated under oath that he did not perform the cable line work in Bradley, his counsel asked BMIC, through its attorneys William Weiler and Abosede Odunsi of Swanson, Martin & Bell, LLP, to dismiss Pasco voluntarily from the suit. Weiler explained that he could not yet determine who was liable for the damage to the Church and could not dismiss Pasco until he received and reviewed the other defendants' discovery responses. Weiler also explained that discovery was still ongoing and key depositions still needed to be taken. In May 2006, Gammell and BMIC entered settlement negotiations while discovery was still open. In July 2006, BMIC settled the suit with Gammell and dismissed its suit against the remaining defendants, including Pasco. This left only Pasco's cross-claim against Gammell.

3

**Discussion**

**1.     Motions for summary judgment**

Pasco and Gammell have both moved for summary judgment on Pasco's cross-claim for indemnification and defense costs. Summary judgment should be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The cross-claim involves legal questions of contract interpretation and thus is particularly well-suited for resolution on summary judgment. *Allstate Ins. Co. v. Tozer*, 392 F.3d 950, 952 (7th Cir. 2004).

Pasco seeks recovery for the attorney fees and other expenses he incurred in defending this case. In April 2003, Pasco and Gammell entered into an agreement for "subcontract work [that] includes but is not limited to . . . Underground Construction." Pasco Cross-claim, Ex. B at 2. In December 2003, Gammell and his team laid cable lines in Bradley as part of his subcontract with Pasco. Pasco contends that under indemnity and duty to defend clauses contained in the subcontract. he is entitled to recover his expenses associated with defending BMIC's subrogee action. The relevant provisions of the subcontract state:

> **Section 7.     Indemnity.**  Subcontractor [Gammell] shall indemnify Contractor [Pasco] and Owner, and hold them harmless against claims, liability, litigation, loss, and expense, including attorney's fees suffered by Contractor or Owner as a result [sic] Subcontractor's performance or nonperformance of the Work required by this Agreement. Subcontractor is obligated to indemnify Contractor and Owner under this paragraph for all the events caused or partly caused by Subcontractor's negligence, wrong doing [sic], or other fault even if Contractor or Owner should also be partly at fault. This indemnity provision shall not, however, apply to the claims, liability, litigation, loss, or expenses caused solely by the state governing this Agreement. In addition, Subcontractor shall reimburse Contractor and Owner for any legal expenses incurred in enforcing the indemnity granted to them under this provision.
>
> **Section 8.     Duty to Defend.**   Subcontractor shall defend Contractor and Owner against any claim, or any legal proceeding which may involve Subcontractor's

obligations under section 7 whether such claim or legal proceeding is brought only against Contractor or Owner either separately or jointly with Subcontractor.

*Id.* at 2. Gammell argues that both the indemnity and duty to defend clauses are unenforceable under an Illinois statute.

In Illinois, contractors may not shift negligence liability to subcontractors through indemnity clauses. Specifically, the Construction Contract Indemnification for Negligence Act, commonly referred to as the "Indemnity Act," provides that

> [w]ith respect to contracts or agreements, either public or private, for the construction, alteration, repair or maintenance of a building, structure, highway bridge, viaducts or other work dealing with construction, or for any moving, demolition or excavation connected therewith, every covenant, promise or agreement to indemnify or hold harmless another person from that person's own negligence is void as against public policy and wholly unenforceable.

740 ILCS 35/1. The Illinois Supreme Court has explained that the purpose of the Indemnity Act is to protect construction industry workers, a purpose that the Act accomplishes by preventing construction companies from avoiding the consequences of their own negligence. *Davis v. Commonwealth Edison Co.*, 61 Ill. 2d 494, 499, 336 N.E.2d 881, 884 (1975).

In *Davis*, the Illinois Supreme Court considered the effect of the Indemnity Act on a provision of a contract between an architect and a general contractor that, as described by the court, "obligated [the general contractor] to pay all claims or judgment for any injuries, whether caused by [the architect's] negligence or not," arising from the construction of a building that evidently was designed by the architect. The architect was sued, along with the general contractor and others, for personal injuries suffered by a construction worker. The court ruled that the Indemnity Act made the contractual indemnity provision unenforceable. *Id.* at 502, 336 N.E.2d at 886.

5

The contractual indemnity provision at issue in *Davis* was void on its face because it expressly indemnified a party for its own negligence. The Indemnity Act may also render a contractual indemnity provision void as applied even if it does not expressly indemnify a party for its own negligence. In *Lavelle v. Dominick's Finer Foods, Inc.,* 227 Ill. App. 3d 764, 592 N.E.2d 287 (1992), the court considered an indemnity agreement almost identical to the one in this case. In *Lavelle,* a contractor called K&S had contracted with Dominick's, which operates a chain of grocery stores, to install a sprinkler system in one of its stores. The plaintiff was an employee of K&S who was injured during the installation and sued Dominick's for negligence and under the Illinois Structural Work Act. Dominick's filed a third party claim against K&S seeking, among other things, indemnity based on their contract, a provision of which required K&S to indemnify Dominick's from any claims, damages, losses, and expenses resulting from performance of K&S's work under the contract caused wholly or partly by K&S's negligence, "regardless of whether or not it is caused in part by [Dominick's]." *Id.* at 769, 592 N.E.2d at 290. The court concluded that under the contract, Dominick's could invoke the indemnity provision only after it was first found liable for negligence or under the Structural Work Act. *Id.* at 769, 592 N.E.2d at 291. "[S]ince Dominick's liability can only result from its own negligent acts," the court concluded, the contractual indemnity provision was void. *Id.* Other Illinois courts have similarly held that when a party invoking an indemnity provision in a construction contract could itself be held liable in the underlying case only for negligence, the Indemnity Act invalidates the provision as it applies in the particular situation. *See Pettie v. Williams Bros. Construction, Inc.,* 225 Ill. App. 3d 1009, 589 N.E.2d 169 (1992) (invalidating contractual indemnity provision requiring subcontractor to indemnify general contractor for losses caused by

subcontractor's failure to comply with laws and regulations, because in the underlying case the contractor was sued only for its own negligence and Structural Work Act violations).

In this case, Brotherhood Mutual sued Pasco for its own alleged negligence. *See* Compl. ¶ 12; Am. Compl. ¶ 13; 2d Am. Compl. ¶14. For this reason, in this case as in *Lavelle* and *Pettie*, the indemnity provision is rendered unenforceable by the Indemnity Act.

The next question concerns the effect, if any, of the Indemnity Act on the duty to defend provision contained in Pasco's contract with Gammell. Under Illinois law, a duty to defend provision that is intertwined with an unenforceable indemnity provision is likewise rendered unenforceable by the Indemnity Act. In *GTE North, Inc. v. Henkels & McCoy, Inc.,* 245 Ill. App. 3d 322, 612 N.E.2d 1375 (1993), the court considered a provision in a contract for construction of a building that required the contractor to indemnify the building owner for all claims arising from the contractor's performance of work under the contract. After reciting the indemnification requirement, the contractual provision stated that

> Contractor, with respect to this Indemnification, agrees to defend and will defend on behalf of [Owner] any suits brought jointly against [Owner] and Contractor or against [Owner] alone, for or arising out of any or all of the aforesaid causes; and will reimburse [Owner] for attorney's fee and other expenses incurred by [Owner] in defending any such suits.

*Id.* at 324, 612 N.E.2d at 1377 (brackets in original). The court ruled that "[w]here a contract for indemnification provides for the indemnitor to defend the indemnitee, that duty is an aspect of the indemnification." *Id.* at 325, 612 N.E.2d at 1377. It stated that the wording of the agreement "seems to tie the purported agreement to defend to the indemnification provision of the agreement so closely that it comes within the prohibition of section 1 of the [Indemnity] Act." *Id.* at 325, 612 N.E.2d at 1278. For that reason, the court concluded, the duty to defend

7

provision was likewise rendered unenforceable by the Indemnity Act. In *W.E. O'Neil Construction Co. v. Gen'l Casualty Co. of Illinois,* 321 Ill. App. 3d 550, 748 N.E.2d 667 (2001), the court likewise indicated, albeit in a slightly different context, that a duty to defend provision that is "tied inextricably" to an unenforceable indemnity agreement is unenforceable. *See id.* at 557, 748 N.E.2d at 672-73.

The duty to defend provision in the Pasco - Gammell contract is intertwined with the indemnity provision that the Court has concluded is unenforceable. Specifically, section 8 of the agreement requires Gammell to defend Pasco against any claim "which may involve [Gammell's] obligations under section 7," the indemnity provision. Pasco Cross-claim, Ex. B at 2. The Court concludes that the duty to defend provision is rendered unenforceable by the Indemnity Act.

Though this result might seem rather harsh, it is ameliorated by the fact that Pasco also included in its contract with Gammell a provision that required Gammell to obtain liability insurance via a policy naming Pasco as an "additional insured." Pasco Cross-claim, Ex. B at 2. Such provisions are not rendered unenforceable by the Indemnity Act. *See, e.g., GTE North,* 245 Ill. App. 3d at 325-26, 612 N.E.2d at 1378. Thus Pasco could have protected itself against its outlay of legal expenses in this case by insisting on Gammell's compliance with that provision (though, unfortunately, it does not appear that Pasco did so).

For these reasons, the Court grants Gammell's motion for summary judgment on Pasco's cross-claim and denies Pasco's motion for summary judgment.

**2.    Motion for sanctions**

Pasco moved for sanctions against BMIC, Odunsi and Swanson, Martin & Bell (collectively, "respondents"), arguing that they violated Rule 11 of the Federal Rules of Civil Procedure, and for sanctions against Odunsi under 28 U.S.C § 1927. Pasco contends that sanctions are warranted because respondents failed to investigate fully whether they had a viable claim against Pasco and did not contact him prior to filing the complaint. Pasco also contends that Odunsi refused to voluntarily dismiss him from the lawsuit after discovery showed he was not involved in the Bradley cable construction work. The Court first addresses Pasco's Rule 11 motion and then analyzes his section 1927 motion.

The central purpose of Rule 11 is to deter baseless or frivolous filings. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990). Under Rule 11, an attorney's filing of a complaint constitutes a certification that to the best of the filer's and signer's knowledge, information and belief, formed after a reasonable inquiry under the circumstances, the pleading is not being presented for an improper purpose, the claims and legal contentions are warranted by existing law or by a nonfrivolous argument for change in the law, and there was evidentiary support for the allegations and factual contentions. FED. R. CIV. P. 11(b)(1)-(3).

In reviewing a Rule 11 motion, a court must focus on what counsel knew at the time the complaint was filed, not what was subsequently revealed in discovery. *Corley v. Rosewood Care Ctr.*, 388 F.3d 990, 1014 (7th Cir. 2004). The court does not view an attorney's actions with the 20/20 vision offered by hindsight. *Id.* When analyzing whether Rule 11 sanctions are appropriate, a court must "undertake an objective inquiry into whether the party or his counsel should have known that his position [was] groundless." *Cuna Mut. Ins. Soc. v. Office and Professional Employees Intern. Union, Local 39*, 443 F.3d 556 (7th Cir. 2006) (citations

9

omitted).

Prior to filing suit, BMIC hired Crawford and Co., a casualty adjusting company, to help investigate the source of the flooding problem. Crawford discussed the incident with Bobby Cullins, the Superintendent of Building Standards and Utilities in the Village of Bradley. Crawford learned from Cullins that the Village had discovered a broken underground sewage pipe near the Church. Cullins concluded that the damage was caused by the force of a cable line that was drilled through the sewage pipe. The spring thaw and heavy rains caused the sewage system to back up, and the surcharge flowed through the spot of the damage into the Church. Documents from the Village of Bradley reflected that the Village spent over $7,000 to repair the broken sewage line, an expense that defendant Ervin reimbursed. Crawford's investigation also revealed that Ervin had entered into a subcontract with Pasco Cable for the cable line project in Bradley. The documents from the Village did not indicate which company had damaged the sewage pipe.

After the investigation by Crawford, BMIC contacted defendant Ervin to request reimbursement for the Church's damages. Ervin forwarded BMIC's claim to Pasco's insurance company. BMIC received no response from either Ervin or Pasco. BMIC therefore forwarded the information it had gathered on the flooding to Weiler and asked him to initiate a subrogation action on its behalf. Weiler reviewed BMIC's investigation and filed suit against Ervin and Pasco on June 28, 2005. In August 2005, Pasco's counsel told respondents that Pasco had subcontracted the Bradley job to Gammell and had done no work on the project itself, and gave respondents Gammell's address. BMIC then filed a second amended complaint adding Gammell as a defendant.

In December 2005, Pasco requested that BMIC voluntarily dismiss him from the suit, explaining that he had not done any of the work at the job site; he had subcontracted the work to Gammell; he had not supervised Gammell's work; and he had not controlled the methods or details of the work at the job site. Pasco's counsel also told BMIC's counsel that Pasco was in extreme financial straits and that the continued prosecution of the suit against him was exacting a heavy burden on Pasco and his family. Weiler explained to Pasco's counsel that until Weiler was convinced of who was liable for the damage at the Church, he could not voluntarily dismiss Pasco. Weiler explained that at the very least, he wanted to review defendants' discovery answers and possibly depose the defendants' responsible representatives to determine each defendants' level of involvement.

In his answers to discovery, Pasco stated that he had not retained the right to manage the Bradley cable site. Respondents, however, note the text of Pasco's contract with Gammell:

> **Right to Withhold Payment**: In addition to Retainage, Contractor shall have the right to withhold payment for defective Work not remedied, failure of the Work to conform to the Contract Documents or other failure of Subcontractor to comply with the terms and conditions of the Contract Documents. Contractor shall be entitled to withhold such amount as may be necessary, in Contractor's good faith opinion, to protect Contractor from loss due to such defects, non-performance or failure to comply. If such deficiencies are not promptly corrected after written notice, Contractor may correct such deficiencies at Subcontractor's expense and deduct all costs incurred from payment due to Subcontractor. The withholding by Contractor of any amounts otherwise due to Subcontractor shall not enable Subcontractor to stop the Work or terminate this Agreement.

Pasco Cross-claim, Ex. B at 4. In short, the subcontract allowed Pasco to pull back the cable installation from Gammell if defects or problems with performance arose. This suggested a colorable question as to whether Pasco had retained control over the project.

Respondents also highlight that BMIC subpoenaed records from the Joint Utility

11

Locating Information Excavator (JULIE), an organization created under the Illinois Utilities Facilities Damage Prevention Act, 220 ILCS 50/1 *et seq*. The Act requires contractors to call a toll-free number to report the location of future excavation jobs and identify the location of underground utilities, including sewer lines, to prevent possible damage during construction projects. The JULIE records that BMIC subpoenaed showed three calls from Pasco to locate underground utilities for the Bradley cable site. This suggested that contrary to its contentions, Pasco had direct involvement in work on the project.

The Court analyzes motions for sanctions under Rule 11 by first determining what the attorney knew at the time the complaint was filed. *Corley*, 388 F.3d at 1014. At the time the complaint was filed, respondents had investigated the source of the sewage damage and had identified Ervin and Pasco as entities who had contracted to perform the cable construction work near the Church. Their investigation revealed that Ervin had subcontracted the work through Fiber Cable, which in turn subcontracted the work to Pasco. Additionally, through pre-suit investigation and discovery, respondents learned that Pasco was involved in the project to some extent, as shown by the records of his calls to JULIE. Thus at the time the complaint was filed, counsel had reason to believe that Pasco was responsible for the cable work that arguably caused the damage to the Church.

In May 2006, Odunsi took Cullins' deposition. He testified that the sewage pipe was damaged when a telecommunications cable pierced an underground sewage pipe near the Church, which allowed rain water to enter the sewage system. The breach in the sewage system ultimately caused the sewage pipe to backup and flood the Church. In Cullins' estimation, the sewage pipe was damaged in December 2003, but the flooding did not occur until the ground had

thawed and several storms had hit the area. Cullins testified that Ervin paid the Village of Bradley for the costs the Village incurred in repairing the broken sewage pipe, but he did not know which defendant was directly responsible for the damage.

After Cullins' deposition, Gammell's attorney told Weiler that he would contact Gammell's insurer and try to obtain settlement authority because it appeared from Cullins' testimony that Gammell was responsible for the damage. On May 25, 2006, Gammell petitioned the Court for an order staying discovery in an effort to settle the case, which the Court granted. Pasco's counsel, Berman, did not object to the motion.

After the Court entered a stay of discovery, Pasco filed a motion to continue a set June status hearing, a motion for leave to delete paragraphs of his cross-claim against Gammell, and a motion to modify the Court's order staying discovery. On June 21, 2006, Judge Pallmeyer, sitting in for this Court, lifted the discovery stay and ordered BMIC to answer Pasco's supplemental discovery requests by July 7, 2006. On July 7, 2006, Pasco moved for sanctions against respondents. During this time, settlement discussions were ongoing between BMIC and Gammell.

BMIC and Gammell agreed to the terms of a settlement on July 19, 2006. Odunsi faxed Pasco's counsel Berman that day advising him of the settlement and that the claims against the remaining defendants were being dismissed. Odunsi also requested that Berman withdraw his motion for sanctions, but Berman declined.

Though Pasco argues that Rule 11 required respondents to contact him prior to filing suit as part of their duty of reasonable inquiry, he does not offer any authority for the proposition beyond the text and his own interpretation of Rule 11. Rule 11 requires a party to perform a

13

reasonable inquiry under the circumstances. FED. R. CIV. P. 11(b)(1)-(3). The Court concludes that Pasco has not shown that respondents failed to perform a reasonable inquiry under the circumstances: they investigated the source of the construction work near the Church, learned that the cable work had been subcontracted to Pasco, discussed the incident with Cullins, and reviewed the JULIE records that showed calls from Pasco regarding the job site. No one had responded to BMIC's inquiries to Ervin, which Ervin had forwarded to Pasco. Under the circumstances, Pasco has not shown that contacting him directly was required to make BMIC's pre-suit inquiry reasonable within the meaning of Rule 11.

Further, there is no basis to conclude that respondents filed suit for an improper purpose or made unsupported claims. Even though Pasco vigorously denied that he had any hand in the Bradley project, the investigation respondents had conducted suggested this might not be correct. The fact that BMIC's claim ultimately proved groundless and was dropped does not entitle Pasco to sanctions under Rule 11. *See Beverly Gravel Inc. v. DiDomenico*, 908 F.2d 223, 226-227 (7th Cir. 1990); *see also Corley*, 388 F.3d at 1014 (party is not subject to sanctions simply because co-defendant settles and underlying claim is dismissed).

Pasco's motion for sanctions under 28 U.S.C. § 1927 arises from Odunsi's refusal to voluntarily dismiss Pasco from the suit once certain discovery allegedly demonstrated that he was not responsible for the construction at the Bradley cable site. Section 1927 states that

> [a]ny attorney or other person admitted to conduct cases in any court of the Unites States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorney's fees reasonably incurred because of such conduct.

The Seventh Circuit has held that a "court may impose sanctions under 28 U.S.C. § 1927, against an attorney where that attorney has acted in an objectively unreasonable manner by

14

engaging in a 'serious and studied disregard for the orderly process of justice' or where a 'claim is without plausible factual or legal basis and lacking in justification.'" *Walter v. Firenzo*, 840 F.2d 427, 433 (7th Cir. 1988) (citations omitted). Sanctions may be imposed for vexatious conduct based on a showing of either subjective or objective bad faith. *Pacific Dunlop Holdings, Inc. v. Barosh*, 22 F.3d 113, 1120 (7th Cir. 1994). The objective standard is satisfied by "extremely negligent conduct, like reckless and indifferent conduct." *Id.*

The Court concludes that imposition of sanctions under section 1927 is not warranted. For the reasons stated earlier, the Court cannot say that counsel's filing of suit against Pasco was so lacking in legal or factual basis as to be implausible. Nor did counsel's continued pursuit of the case despite statements by Pasco and its counsel amount to either objective or subjective bad faith. Given the existence of some evidence of Pasco's direct involvement in, or ability to control, the cable work, it was not unreasonable for BMIC's counsel to want verification of Pasco's non-involvement from someone other than Pasco itself. Once that evidence was obtained, BMIC promptly dismissed its claims against Pasco. Under the circumstances, there is no evidence that Odunsi engaged in conduct that demonstrated a serious and studied disregard for the orderly process of justice. *Walter*, 840 F.2d at 433. For these reasons, the Court denies Pasco's motion for sanctions.

**Conclusion**

For the reasons stated above, the Court denies Pasco's motion for summary judgment [docket no. 74], grants Gammell's motion for summary judgment [docket no. 66], and denies Pasco's motion for sanctions [docket no. 58]. Gammell's motion for leave to file an amended affirmative defense is terminated as moot [docket no. 62]. The Clerk is directed to enter

15

judgment in favor of Gammell on Pasco's third party claim. Because all other claims have been disposed of, the case is terminated.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: November 27, 2006